IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BRIAN D. NEEFE, individually and as next of friend to Lacey Knudson, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Civil Action No. 04-366-KAJ |
| RODNEY LAYFIELD and DELAWARE STATE POLICE, | ) ) ) | |
| Defendants. | ) | |

## AFFIDAVIT OF SERGEANT RODNEY LAYFIELD

Sergeant Rodney Layfield, being duly sworn, deposes and states as follows:

1. I am a Sergeant with the Delaware State Police currently assigned to Troop 7 in Lewes as the Shift Supervisor for Patrol Shift "C."

2. I make this affidavit in support of the defendants' motion for summary judgment. Unless otherwise indicated, I have personal knowledge of all of the facts set forth in this affidavit.

3. The Delaware State Police hired me as a Recruit Trooper in November 1994. I graduated from the State Police Training Academy in March 1995. From January 1999 through September 2004 I was assigned to the Governor's Task Force at Troop 4 in Georgetown. At the time of the arrest that is the subject of this lawsuit, I held the rank of Corporal. The other members of the GTF unit in Sussex County at the time of the arrest of the plaintiff on January 23, 2004 were: Sergeant Colby A. Cox, the supervisor of the unit; Corporal John J. McColgan; and Trooper First Class Lance P. Skinner; and Probation Officers Edward Joyce and Eric Reuther.

4.    The GTF is a partnership between the State Police and the Office of Probation and Parole to engage in an aggressive initiative to reduce Part I crimes.  As set forth in the GTF's mission statement:  "The primary goal of the Governor's Task Force is to reduce the amount of crime experienced in Delaware, particularly as it relates to violations of Delaware law involving controlled substances, violent crime, and other criminal behavior which diminishes the quality of life in our communities.  This unit will use several methods and strategies for accomplishing this goal" including: "Identify crime trends within the individual unit's jurisdiction related to drug activity and the related crime it generates."

5.    In combatting illegal drug activity, the GTF often relies on confidential informants. One confidential informant (known as "Eddie"), had proved reliable in the past by providing information to our unit that resulted in an arrest for illegal drugs and weapons.

6.    On January 23, 2004, Eddie contacted one of the Troopers in our GTF unit, TFC Lance Skinner, and told Skinner that he could buy prescription drugs from a subject named Brian who resided on Rehoboth Avenue.  Eddie told Skinner that Brian drives an older model maroon Oldsmobile passenger vehicle displaying Pennsylvania registration DWH-4958.  Eddie told Skinner that he had contacted Brian earlier in the day to see if he could buy prescription drugs. Eddie told Skinner that he had purchased prescription pills from Brian in the past.  Brian told Eddie that he could sell him eighteen 5ml valium pills for $50.00 and two white morphine pills for $30.00 each.

7.    Later that day on January 23, 2004, our GTF unit met at Troop 4 to de-brief about current events.  TFC Skinner shared with me and the other members of the unit the information he had received from Eddie about Brian selling prescription drugs.  We decided to investigate the matter

further because the selling of prescription drugs has become a serious problem in Sussex County.

       8.       In the early evening of January 23, 2004, TFC Skinner and a probation officer (Joyce) picked up Eddie and drove to Rehoboth Avenue, where Eddie pointed out the maroon Oldsmobile displaying Pennsylvania registration DWH-4958 which was parked across from the Post Office in front of the building where Eddie said Brian resided with his wife and daughter. An NCIC check was conducted on the maroon Oldsmobile and it was registered to Brian Neefe, a resident of Pennsylvania.

       9.       Eddie called Neefe on the telephone from Skinner's car (the call was tape-recorded) and arranged to meet with Neefe at the Jiffy Lube on Route One north of Midway to buy the drugs.

       10.       At the time, I was in an unmarked car just outside Rehoboth, but was in constant radio contact with TFC Skinner, who relayed to me all of the information the other officers in the unit were gathering about Neefe and the drug buy. TFC Skinner informed me when the suspect left his apartment building right after the call from Eddie to buy drugs. Eddie made a positive identification that the man leaving the building was Brian. TFC Skinner described Neefe's physical appearance and the model and color of his car. Skinner also told me that Neefe had placed an infant child in a car seat in the back seat of the car. TFC Skinner also told me that Neefe had put an orange plastic bucket which he placed in the front passenger seat of the car.

       11.       A few minutes later, I observed Neefe's vehicle leaving Rehoboth traveling north. I began to follow the vehicle as it drove north on Route One in the right-hand lane. TFC Skinner, the probation officer, and Eddie were in a third unmarked vehicle headed for Jiffy Lube on Route One. The plan was either to follow Neefe to the drug drop point or, if he committed a traffic

violation, to stop him for the traffic violation.

12. I observed Neefe's vehicle cross the "fog line" on the right shoulder of Route One three times over the course of around 3/4 of a mile. Each time, his vehicle swerved 2-3 feet into the shoulder. I observed Neefe turning around as though to look back to the infant in the rear car seat, causing him to take his eyes off the road and his car to cross the fog line into the shoulder.

13. I was concerned that Neefe might be under the influence of drugs because I knew from the confidential informant that Neefe had prescriptions to morphine and valium. I was also concerned about the safety of the infant in the back seat due to Neefe's erratic driving. I activated my emergency equipment (lights, no siren) to make a traffic stop for failure to stay in lane and careless/inattentive driving. Neefe turned right off of Route One into a parking lot near the Roadhouse restaurant and came to a stop. I pulled my vehicle in right behind him.

14. I approached the driver's side of the vehicle, and Neefe rolled his window down. I noticed the infant in the car seat in the rear of the car. Neefe appeared very nervous, and had difficulty producing his driver's license, registration, and proof of insurance. On the front passenger seat of the car was an orange, five-gallon Home Depot paint bucket. I asked Neefe what was in the bucket, and he took the top off and showed me. Inside the bucket I saw hypodermic needles and a number of small plastic bottles that appeared to be for prescription drugs.

15. I then asked Neefe to get out of the car. I searched him but did not find any drugs or weapons.

16. At that point, I told Neefe that he was under arrest and I put my hand-cuffs on him and placed him in the rear of my unmarked vehicle. The parking lot where both are vehicles

were stopped was dark (it was after 7:00 p.m. in January). My vehicle had a protective barrier between the back and the front seats that obstructed any view Neefe may have had out the front of the vehicle.

17.     I then searched the inside of Neefe's car, under the seats and in the rear of the car. I did not search the car seat or the infant sitting in the car seat in the rear. I did not search the trunk. Other than the orange bucket filled with prescription drugs, I did not find any other drugs.

18.     Neefe had told me shortly after the traffic stop that his girlfriend worked at the Roadhouse restaurant. One of the other Troopers at the scene (Corporal McColgan) went inside the restaurant to inform her about the situation so she could take custody of the infant child and Neefe's car, which she did.

19.     I then drove Neefe to Troop 7 for processing. He was at Troop 7 for approximately 45 minutes. During that time, I conferred with my supervisor, Sergeant Colby Cox, and other members of the GTF unit. We believed that in order to prosecute Neefe it might be necessary to disclose the identity of our confidential informant. We did not want to do that because he had proved reliable in the past and we hoped to use him again. Rather than risk losing a proven reliable source, we decided not to pursue prosecution. Neefe's girlfriend came to Troop 7 and took him home. We returned the orange bucket to Neefe with his prescriptions.

20. The GTF arrest report charged Neefe with possession with intent to deliver a narcotic Schedule II controlled substance (opium or derivative) (16 Delaware Code § 4751). I did not issue a traffic citation to Neefe for failing to stay in lane, or for careless or inattentive driving.

/s/   Sergeant Rodney Layfield
Sergeant Rodney Layfield

Subscribed and sworn before me
this 19th day of August, 2005

/s/   W. Michael Tupman
W. Michael Tupman
Deputy Attorney General
Pursuant to 29 Del. C. § 2508

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 22nd day of August, 2005, I served electronically a copy of the Affidavit of Sergeant Rodney Layfield, and on that same date served two copies of the same affidavit by first-class mail, postage prepaid, to:

>Edward C. Gill, Esquire
>16 N. Bedford Street
>P.O. Box 824
>Georgetown, DE 19947
>Counsel to Record for Plaintiff

/s/   W. Michael Tupman
W. Michael Tupman

I:\TUPMAN\FILES\neefe.layfield.aff.wpd