IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BRIAN NEEFE, individually and as next of friend to Lacey Knudson, | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 04-366-KAJ |
| RODNEY LAYFIELD, and DELAWARE STATE POLICE, | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

---

Edward C. Gill, Esq.,16 N. Bedford Street, P.O. Box 824, Georgetown, Delaware 19947; Counsel for Plaintiff.

W. Michael Tupman, Esq., Deputy Attorney General, Delaware Department of Justice, 102 W. Water Street, Third Floor, Dover, Delaware 19904; Counsel for Defendants.

---

November 7, 2005
Wilmington, Delaware



**JORDAN, District Judge**

## I. INTRODUCTION

Brian Neefe ("Plaintiff"), on behalf of himself and his daughter Lacey Knudson, brought this suit against Rodney Layfield ("Layfield") and the Delaware State Police ("the State Police") (collectively, "Defendants"), claiming, under 42 U.S.C. § 1983, that Defendants violated the Fourth Amendment of the U.S. Constitution, and also claiming unlawful imprisonment in violation of Delaware state law. Before me is Defendants' Motion for Summary Judgment under Fed. R. Civ. P. 56(c). (Docket Item ["D.I."] 33; the "Motion.") The court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331, 1343, and 1367; jurisdiction over the parties and venue are uncontested. For the reasons that follow, I will grant the Motion.

## II. BACKGROUND[1]

The relevant events of January 23, 2004 are described in the sworn affidavits of Plaintiff (D.I. 39 at 16-17; "Plaintiff Aff.") and Layfield (D.I. 35; "Layfield Aff.").

### A. Events Leading Up to the Traffic Stop

On January 23, a confidential informant known as "Eddie" contacted Trooper First Class Lance Skinner ("Skinner"), a member of the Governor's Task Force ("GTF") in Sussex County, Delaware. (Layfield Aff. at ¶6.) "The GTF is a partnership between the State Police and the Office of Probation and Parole to . . . reduce the amount of crime experienced in Delaware, particularly as it relates to violations of Delaware law involving controlled substances, violent crimes, and other criminal behavior . . . ." (*Id.* at

---

[1]The following background information is taken from the parties' submissions and does not constitute findings of fact.

¶4.) Eddie "had proved reliable in the past by providing information to [the GTF] that resulted in an arrest for illegal drugs and weapons." (*Id.* at ¶5.)

According to Layfield, Eddie told Skinner that "he [Eddie] could buy prescription drugs from a subject named Brian who resided on Rehoboth Avenue." (*Id.* at ¶6.) "Eddie told Skinner that he had purchased prescription pills from Brian in the past," and that he had contacted Brian earlier in the day and was told that he could buy "eighteen . . . valium pills for $50.00 and two white morphine pills for $30.00 each" from Brian. (*Id.*) Plaintiff disputes that he made any such agreement, stating that he "had not agreed to make any drug sale or to deliver any drugs to 'Eddie' or any other person." (Plaintiff Aff. at ¶2.) According to Layfield, Eddie also described Brian's car as "an older model maroon Oldsmobile passenger vehicle displaying Pennsylvania registration DWH-4958." (Layfield Aff. at ¶6.)

Skinner shared the information he had received from Eddie with other members of the GTF, including Layfield (*id.* at ¶3), and the group "decided to investigate the matter further." (*Id.* at ¶7.) In the early evening of January 23, Skinner, along with a probation officer named Joyce and with Eddie, drove to Rehoboth Avenue, where Eddie pointed out a car that matched his description of Brian's car and was parked in front of the building where Eddie said that Brian lived with "his wife and daughter." (*Id.* at ¶8.) "An NCIC check was conducted on the maroon Oldsmobile and it was registered to [Plaintiff] Brian Neefe . . . ." (*Id.*)

While Layfield was not with Skinner, Joyce, and Eddie, he "was in constant radio contact with TFC Skinner, who relayed to [him] all of the information the other officers in

the unit were gathering about [Plaintiff] and the drug buy." (*Id.* at ¶10.) According to Layfield, "Eddie called [Plaintiff] on the telephone from Skinner's car (the call was tape recorded) and arranged to meet with [Plaintiff] at the Jiffy Lube on Route One north of Midway to buy the drugs." (*Id.* at ¶9.) Again, Plaintiff disputes this, stating that he "had not agreed to make any drug sale or to deliver any drugs to 'Eddie' or any other person." (Plaintiff Aff. at ¶2.)

"[R]ight after" this phone call, Skinner informed Layfield that Plaintiff had left his apartment building. (Layfield Aff. at ¶10.) Eddie identified Plaintiff, and Skinner described Plaintiff's appearance and his car to Layfield. (*Id.*) Skinner also told Layfield that Plaintiff "had placed an infant child in a car seat in the back seat of the car," and that Plaintiff put "an orange plastic bucket . . . in the front passenger seat of the car." (*Id.*) Soon thereafter, Layfield, who was in an unmarked car outside of Rehoboth, observed Plaintiff driving "north on Route One" out of Rehoboth. (*Id.* at ¶11.) Plaintiff agrees that he "was driving [his] vehicle north bound on Route 1," and that "[his] six month old daughter, Lacey, was a passenger in the vehicle at that time." (Plaintiff Aff. at ¶1.) While Skinner, Joyce, and Eddie drove to the Jiffy Lube, Layfield followed Plaintiff, planning "either to follow [him] to the drug drop point or, if he committed a traffic violation, to stop him for the traffic violation." (Layfield Aff. at ¶11.)

B. <u>Layfield's Account of the Traffic Stop and Arrest</u>

According to Layfield's sworn affidavit, he observed, while he was following Plaintiff, that Plaintiff's vehicle "cross[ed] the 'fog line' on the right shoulder of Route One three times over the course of around 3/4 of a mile." (*Id.* at ¶12.) Layfield also

saw Plaintiff "turning around as though to look back to the infant in the rear car seat, causing him to take his eyes off the road and his car to cross the fog line into the shoulder." (*Id.*) Layfield then used his emergency lights to stop Plaintiff. (*Id.* at ¶13.) Layfield was "concerned that [Plaintiff] might be under the influence of drugs," and also "about the safety of the infant in the back seat due to [Plaintiff's] erratic driving." (*Id.*)

Layfield "approached the driver's side of the vehicle, and [Plaintiff] rolled his window down." (*Id.* at ¶14.) Layfield saw the infant in the back seat. (*Id.*) Plaintiff "appeared very nervous, and had difficulty producing his driver's license, registration, and proof of insurance." (*Id.*) Layfield saw "an orange, five-gallon Home Depot paint bucket" in the front passenger seat and asked Plaintiff what was inside. (*Id.*) Plaintiff removed the lid and Layfield saw "hypodermic needles and a number of small plastic bottles that appeared to be for prescription drugs" inside. (*Id.*) Layfield then asked Plaintiff to get out of the car. (*Id.* at ¶15.) He searched Plaintiff but found no drugs or weapons. (*Id.*)

Layfield then told Plaintiff that he was under arrest, handcuffed him, and placed him in the rear of the police car. (*Id.* at ¶16.) Layfield "searched the inside of [Plaintiff's] car, under the seats and in the rear of the car." (*Id.* at ¶17.) Layfield states that he did not search the trunk, the infant car seat, or the infant in the car seat. (*Id.*) "Other than the orange bucket filled with prescription drugs, [Layfield] did not find any other drugs." (*Id.*) According to Layfield, the area where the vehicles were parked was dark, and Plaintiff's view was obstructed by "a protective barrier between the back and front seats" in Layfield's vehicle. (*Id.* at ¶16.)

Sometime during these events, Plaintiff told Layfield that his girlfriend worked at a nearby restaurant. (*Id.* at ¶18.) Another trooper "inform[ed] her about the situation," and she took custody of the infant child and Plaintiff's car. (*Id.*)

Layfield then drove Plaintiff to the station for processing. (*Id.* at ¶19.) The GTF unit, including Layfield's supervisor, "believed that in order to prosecute [Plainitff] it might be necessary to disclose" Eddie's identity. (*Id.*) So they "decided not to pursue prosecution." (*Id.*) Plaintiff's girlfriend picked him up, and his orange bucket "with his prescriptions" was returned. (*Id.*) Plaintiff was at the station for "approximately 45 minutes." (*Id.*) The arrest report charged Plaintiff with "possession with intent to deliver a narcotic Schedule II controlled substance." (*Id.* at 20.) Layfield did not issue a traffic citation. (*Id.*)

C. <u>Plaintiff's Account of the Traffic Stop and Arrest</u>

Plaintiff denies violating any motor vehicle laws. (Plaintiff Aff. at ¶3.) "Specifically, [he states that he] did not leave [his] lane of travel and go over the fog line and travel on the shoulder of the roadway." (*Id.*) He agrees that he was "stopped by an officer of the Delaware State Police." (*Id.* at ¶4.)

After Layfield pulled him over, Plaintiff says that Layfield "had [him] get out of [his] vehicle, handcuffed [him], and placed [him] in a Delaware State Police vehicle," and at some point, searched him. (*Id.* at ¶5.) Layfield then searched Plaintiff's vehicle. (*Id.* at ¶6.) Layfield "specifically searched [Plaintiff's] six month old daughter, Lacey, removing all of her clothing, including her diaper." (*Id.*)

Plaintiff denies having "hypodermic syringes or any other type of syringe in [his] vehicle." (*Id.* at ¶7.) "The only drugs which were present in [his] vehicle were drugs which were properly prescribed to [him] and which were in their proper containers." (*Id.*)

Finally, Layfield told him that he was being taken into custody because of outstanding arrest warrants, which, according to Plaintiff, do not exist. (*Id.* at ¶8.)

## III. STANDARD OF REVIEW

A court may grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Celotex v. Catrett*, 477 U.S. 317, 323 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995). A court should not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

## IV. DISCUSSION

Plaintiff brings this action under 42 U.S.C. § 1983 against Layfield, claiming that Layfield violated the Fourth Amendment of the U.S. Constitution by arresting and searching Plaintiff, searching Plaintiff's daughter Lacey, and searching Plaintiff's vehicle, all without probable cause. Plaintiff also claims that he was unlawfully imprisoned. Plaintiff brings the same claims against the State Police. Plaintiff is seeking compensatory and punitive damages for the violation of his civil rights and emotional harm.

In support of this Motion, Defendants first argue that the Eleventh Amendment of the U.S. Constitution bars Plaintiff's claims for money damages against the State Police and against Layfield in his official capacity, both for the constitutional claim and the state law unlawful imprisonment claim. Second, Defendants argue that the State Police and Layfield in his official capacity are not "persons" acting under color of state law, and so they cannot be liable under 42 U.S.C. § 1983. Third, Defendants argue that there is no genuine issue of material fact concerning Layfield's probable cause to arrest Plaintiff. Since the searches were incident to this lawful arrest, Defendants argue that summary judgment must be granted on all claims. Fourth, Defendants argue that Layfield is entitled to qualified immunity from suit, because Layfield had probable cause, or at least reasonably believed that he had probable cause, to make the arrest.

A portion of the case is no longer in dispute. Plaintiff concedes that summary judgment on all claims must be granted for the State Police and for Layfield in his official capacity, leaving only the claims against Layfield as an individual.[2] (D.I. 39 at 8.)

As to the remaining claims, Defendants argue that Layfield had probable cause to arrest Plaintiff for a suspected drug trafficking violation.[3] If Layfield had probable cause to arrest, then the searches were permissible as incident to a lawful arrest. *See New York v. Belton*, 453 U.S. 454, 460 (1981) (allowing searches of the passenger compartment of a vehicle incident to a lawful arrest); *United States v. Robinson*, 414 U.S. 218, 224 (1973) (allowing searches of an arrestee).

The following undisputed evidence shows that Layfield did indeed have probable cause: (1) Eddie informed the police about Plaintiff's illegal drug activities; (2) Eddie was an informant who had proven reliable in the past; (3) Eddie identified Plaintiff and his car with specificity; (4) Eddie's identification of Plaintiff as "Brian" was corroborated by the vehicle registration for Plaintiff's car; (5) Eddie made a telephone call in which he purported to arrange a meeting with Plaintiff; and (6) immediately after that call, Plaintiff

---

[2]The Eleventh Amendment deprives federal courts of subject matter jurisdiction over claims for retroactive money damages against a state or against a state official when "the state is the real, substantial party in interest." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100-01 (1984). Thus, the Eleventh Amendment bars all of Plaintiff's claims against the State Police and against Layfield in his official capacity. Also, Section 1983 authorizes claims against a "person" who, under color of law, deprives another of rights secured by the Constitution of the United States. 42 U.S.C. § 1983. But "neither a State nor its officials acting in their official capacities are 'persons' under Section 1983." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989).

[3]Defendants concede that a genuine issue of material fact remains concerning whether Layfield had probable cause to arrest Plaintiff for a motor vehicle violation, because Plaintiff denies that any such violations occurred. (Plaintiff Aff. at ¶3.)

left his apartment, placed a container in his car, and drove toward the location Eddie had specified in the phone call. (*See* Layfield Aff. at ¶¶6-10.) Although Plaintiff denies "agree[ing] to make any drug sale or to deliver any drugs to 'Eddie' or any other person" (Plaintiff Aff. at ¶2), the information presented to Layfield was sufficient, under the totality of the circumstances, to give him probable cause to believe that Plaintiff was traveling to meet Eddie and complete an illegal drug sale. "[V]iewed from the standpoint of an objectively reasonable police officer," *Ornelas v. United States*, 517 U.S. 690, 696 (1996), there was an appropriate basis to arrest Plaintiff. Even if that were not so, however, at a minimum, the information was enough to support reasonable suspicion justifying the traffic stop, *see Terry v. Ohio*, 392 U.S. 1, 21 (1968) ("police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant ... intrusion [of a stop]."), which suspicion then rose to the level of probable cause when Plaintiff voluntarily showed the drugs to Layfield (Layfield Aff. at ¶14).[4]

Thus, I conclude that there is no genuine issue of material fact concerning Layfield's probable cause to arrest Plaintiff for a drug violation, and the accompanying search or searches were incident to a lawful arrest.[5]

---

[4]Because the arrest was lawful, Plaintiff's unlawful imprisonment claim must fail. *See* 11 *Del. Code* § 782 (unlawful imprisonment is knowingly and unlawfully restraining another person under circumstances which expose that person to the risk of serious physical injury). Even if Layfield did not have probable cause, he is protected by qualified immunity from liability in this case, because, given the detailed information presented to him about the proposed drug sale, his mistake would have been reasonable. *See Saucier v. Katz*, 533 U.S. 194, 205 (2001).

[5]Plaintiff argues that the search of the infant Lacey was outside the scope of a lawful search. While Layfield denies searching Lacey's clothing or her car seat

## V. CONCLUSION

Accordingly, I will grant the Motion for Summary Judgment. An appropriate order will issue.

---

(Layfield Aff. at ¶17), such a search, if it did occur, would not have been unreasonable, given her position in the car's passenger compartment, the possibility of drugs being hidden in her clothing or her seat, and the inability of an infant to resist being used in such a way or to communicate in any meaningful way.